1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANDRE PULIDO,                      No.  2:13-cv-01814 TLN GGH

12            Petitioner,

13        v.                            FINDINGS AND RECOMMENDATIONS

14   RANDY GROUNDS,

15            Respondent.

16

17   _____

18   *Introduction and Summary*

19        Petitioner, Andre Pulido, seeks federal habeas corpus review of his state conviction:

20        Following the denial of a motion to suppress evidence (Pen.Code, § 1538.5), a jury
         found defendant Andre Pulido guilty of the first degree murder of Rodrigo
21        Rodriguez, Jr. (§ 187, subd. (a)). The jury also found true allegations he used a
         firearm in the commission of the murder (§ 12022.53, subds.(b)-(d)) and
22        committed the murder while lying in wait (§ 190.2, subd. (a)(15)). The trial court
         sentenced defendant to life in prison without the possibility of parole for the
23        special circumstance murder, plus a consecutive 25 years to life for the firearm
         enhancement. The court also imposed, among other things, a $10,000 parole
24        revocation fine. (§ 1202.45.)

25   People v. Pulido, 2011 WL 3557019 *1 (Cal. App. 2011) (footnote omitted).

26        Petitioner raises numerous issues:

27   1.        Pulido's right to due process guaranteed by the Fourteenth Amendment was

28
                                1

1   violated by the admission of material, false evidence against him, specifically, a false

2   pretrial photographic identification by the lone eyewitness to positively identify him.

3   2.   Pulido received ineffective assistance of counsel under the Sixth and Fourteenth

4   Amendments to the United States Constitution when his trial counsel made, but failed to

5   support, a request for a foundational hearing regarding critical prosecution evidence that

6   should not have been admitted under controlling state evidentiary law.

7   3.   Pulido received ineffective assistance of counsel under the Sixth and Fourteenth

8   Amendments to the United States Constitution when his trial counsel failed to object to

9   the testimony of the cellphone service provider's custodian of records regarding the

10  identification of cellphone locations from specified cell towers on the ground that it was

11  improper lay testimony.

12  4.   Pulido's right to due process guaranteed by the Fourteenth Amendment to the

13  United States Constitution was violated by the admission of material, false evidence

14  against him, specifically, the testimony of a cellphone service provider's custodian of

15  records that the location of Pulido's cellphone could be accurately and reliably

16  ascertained from certain business records of the provider.

17  5.   Pulido received ineffective assistance of counsel…

18  when his appellate counsel failed to challenge on direct appeal the trial court's refusal to

19  conduct a Kelly hearing and to exclude an exhibit that illustrated the cellphone-locating

20  testimony of the cellphone service provider's custodian of records.

21  6.   Pulido received ineffective assistance of counsel…

22  when his trial counsel failed to consult with an expert in cellphone-locating technology

23  and to call such an expert as a witness to rebut the prosecution's cellphone-locating

24  evidence.

25  7.   Pulido received ineffective assistance of counsel…

26  when his trial counsel negligently opened the door to previously excluded photographic

27  evidence that suggested his association with a gang lifestyle and undercut the credibility

28  of a witness helpful to the defense.

2

8.     Pulido received ineffective assistance of counsel …

       when his trial counsel failed to call  available character witnesses to testify as to their

       opinions of Pulido's non-violent character.

9.     Pulido received ineffective assistance of counsel…

       when his trial counsel failed to perform an adequate pretrial investigation.

10.    Pulido suffers from illegal restraint because he is actually innocent.

11.    Pulido received ineffective assistance of counsel…

       as the result of the cumulative impact of all of the deficiencies in counsel's performance.

12.    Pulido's constitutional right to confrontation guaranteed by the Sixth and Fourteenth

       Amendments to the United States Constitution, right to due process guaranteed by the

       Fourteenth Amendment, and right to compulsory process guaranteed by the Sixth and

       Fourteenth Amendments were violated by the trial court's refusal to permit the defense to

       impeach the credibility of a witness who had testified that Pulido had made incriminating

       admissions, with the fact that he had previously lied to police.

       For the reasons set forth herein, and after thorough review, the undersigned recommends

that the petition be denied.

*Background Facts*

       As is often the case, the appellate opinion in this case sets forth the pertinent facts:

       **A. Defendant is shot on September 2, 2007**

       On the evening of September 2, 2007, defendant attended a party
       with his girlfriend Francine Guzman, his friend Oliver Garrett, and
       Garrett's girlfriend. While defendant and the others were drinking
       in the backyard, Guzman's cousin, Joseph Garcia, arrived with two
       or three other men. Garcia, who previously had been associated
       with the Bloods street gang, "exchanged some looks" with Garrett.
       Defendant introduced the two men, and they shook hands. Later, a
       song began playing and Garrett began doing the "Crip dance" and
       said, "Valley Hi Crips." When Garcia saw and heard Garrett, the
       two men again exchanged hostile looks.

       Guzman and defendant asked Garrett and his girlfriend to leave the
       party "so nothing further would happen," and they did. Shortly
       thereafter, Garcia left with four or five men. As Garrett walked
       away from the party, he and Garcia exchanged words, including
       "Crip" and "Blood." Garcia lifted up his shirt and displayed a gun
       in his waistband. Defendant attempted to intervene, and Garcia shot

3

him in the face.

Guzman told a friend that defendant "went crazy" after he was shot. Several days later, defendant's brother telephoned Guzman and asked if she "knew that it was [her] cousin Joseph [Garcia]" who shot defendant, where Garcia lived, and what kind of car he drove. Guzman responded that she did not know whether Garcia was involved, where he lived, or what kind of car he drove. Guzman never saw defendant with a handgun, and she would not have dated him if he had one. Gangs were not any part of defendant's life.

**B. Rodriguez is murdered on September 16, 2007**

Rodriguez, the victim in this case, was Garcia's cousin. In September 2007, Rodriguez was a student at UC Berkeley. He returned home to Sacramento on weekends to cut hair and earn money for college. He rented a chair at the House of Skillz Barber Shop on Martin Luther King Jr. Boulevard.

At approximately 5:30 p.m. on September 16, 2007, Rodriguez and his half-brother Andrew Lopez went to the barber shop so that Rodriguez could cut Lopez's hair. Rodriguez drove them there in his blue Mustang, which he parked in front of the shop. The shop was closed, but Rodriguez opened the door with his key and locked the door behind them. No one else was in the shop at that time. It took Rodriguez about 40 minutes to cut Lopez's hair. When he was nearly finished, the building manager, Lorenzo Walsh, stopped by. Walsh coached a Pop Warner football team and was returning some equipment he stored elsewhere in the building. Rodriguez and Walsh exchanged pleasantries and Walsh left. When Rodriguez was finished cutting Lopez's hair, they cleaned up and prepared to leave.

Lopez left the shop first, while Rodriguez turned off the power. While Lopez was waiting for Rodriguez outside, he saw a man crouched down on the side of the building. As Rodriguez walked outside, the man came around the corner, fired two shots at Rodriguez, then pointed the gun at Lopez. Lopez dove underneath Walsh's truck, which was parked in front of the shop. When Walsh started the truck, Lopez rolled out from underneath it and saw the shooter straddle Rodriguez and shoot him four or five more times. Lopez then ran to get help.

At 6:40 p.m., Sacramento police were dispatched to the scene. Rodriguez was pronounced dead at 6:48 p.m. He was shot six times—once in the abdomen, once in the right buttock, and twice in the upper and lower back.

Lopez described the shooter as a light-skinned African American or Puerto Rican man, with long dark hair that was pulled back in a ponytail, between 18 and 24 years old, between 5 feet 10 inches and 6 feet 2 inches tall, thin build, between 150 and 165 pounds, with acne scars or razor bumps along his jaw line, and wearing a red t-shirt with some kind of design on it and faded black jean shorts. Shortly after the shooting, Lopez worked with a sketch artist in

creating a composite sketch of the shooter.

At trial, Lopez testified that he did not believe defendant was the shooter. He explained that the person who shot his brother had long hair, little sideburns, a "little jawline [sic ] hair," and more acne scars than defendant had at trial. He believed the people in Walsh's truck would have gotten a better look at the shooter because the shooting happened right in front of them. Bert Moore, a parent volunteer, and three of Walsh's young players—Dejanerio Woldridge, Demariae Woldridge, and Derayne Duncan—were sitting in Walsh's truck at the time of the shooting.

 As Walsh turned to get into his truck to leave, he heard multiple gun shots. He watched as the shooter continued to fire shots at Rodriguez. He heard the shooter say, "Punk mother fucker," "Bitch mother fucker," or "Bitch ass mother fucker." Once inside the truck, Walsh fumbled around, and finally was able to start the truck and drive off. After he got the children to safety, he returned to the shop.

Walsh described the shooter as black and white or white and Hispanic, light-skinned, with long hair that was pulled back in a ponytail, in his mid-twenties, with facial hair, slim, approximately 5 feet 10 inches tall, 160 pounds, and wearing a plain red t-shirt and knee length blue jeans. Walsh thought defendant looked like the shooter but could not positively identify him as the shooter. Walsh met with the sketch artist and was shown the composite drawing that was created based on Lopez's description. The sketch artist altered the shooter's hair after meeting with Walsh.

Prior to the shooting, Moore noticed a man sitting on the side of the building. It appeared to Moore that he was smoking a cigarette while waiting for a haircut. When Moore, who was seated in the front passenger seat of Walsh's truck, heard the gunshot, he ducked. He then heard a series of other shots and someone say, "Your momma [F]rench you, bitch ass mother fucker." Moore observed the same man he saw standing next to the building prior to the shooting walking away from the building after the shooting. Moore described the man as mixed race, possibly Puerto Rican or Cuban, with his hair in a ponytail, approximately 6 feet and 1 inch tall, between 160 and 170 pounds, and wearing a red shirt. On November 16, 2007, Moore picked defendant out of a photographic lineup as the man he saw walking away from the building after the shooting. At trial, Walsh testified the man he saw after the shooting looked similar to the defendant, but he was not positive defendant was that man.

At the time of the shooting Demariae and Dejanerio Woldridge were seated in the back seat of Walsh's truck. Demariae was 10–years–old, and Dejanerio was 6–years–old. Each described the shooter as light-skinned, with black hair that was pulled back in a ponytail. At trial, Demariae testified the shooter was wearing a white t-shirt, and Dejanerio testified the shooter was white.

Demariae was shown several pictures of defendant's car and positively identified it as the car he saw the shooter get into after the shooting. Prior to identifying defendant's car as the getaway car, Demariae described the getaway car as a large, blue four door with tinted windows and shiny rims. Defendant's car did not have rims. Dejanerio described the car as a large, dark blue car. At trial, Dejanerio described the car as a gray, four door car with tinted windows.

Immediately after the shooting, a neighbor who witnessed the shooter get into a car described the car as a "small black newer compact." At trial, the neighbor testified the car was a four door, medium-sized, dark colored car.

Four other witnesses observed a man standing alongside the building prior to the shooting or the shooting itself. Each of the witnesses generally described the man they saw as mixed race, possibly Hispanic and African American or Puerto Rican, with light skin, long curly dark hair, in his 20s, between 5 feet 6 inches and 5 feet 10 inches tall, around 150 pounds, and wearing a red t-shirt. Three of the four witnesses indicated the man's hair was partially pulled back or in a ponytail. One of the four witnesses was able to positively identify defendant as the shooter, stating she was 90 percent sure of her identification.

Defendant is half African American and half Mexican. In September 2007, he drove a blue Buick LeSabre and had shoulder length hair that he typically wore in a ponytail. Telephone records for defendant's cellular telephone indicated no calls were made to or from defendant's phone around the time of the murder. The records also reflected that the phone was in the general vicinity of the murder at 5:56 p.m.

On October 5, 2007, officers executed a search warrant at defendant's home in Elk Grove. Defendant's cousin, Bernardino Dalaza, was in the front bedroom when officers arrived. The door to defendant's bedroom was locked. A detective picked the lock and officers discovered a loaded semi-automatic handgun inside a shoebox in defendant's bedroom closet. Later that day, the Sacramento Country Crime Lab confirmed that the gun found in defendant's closet was the gun used to murder Rodriguez. No fingerprints were found on the box, the magazine, the live rounds, the firearm, or the spent shell casing collected at the scene. DNA was recovered from the trigger of the firearm. Defendant could not be eliminated as a contributor.

A laptop computer was also seized from defendant's bedroom. A forensic examination of the computer revealed that defendant's name was listed as a user name for the computer. The examination also revealed that the computer had been used to conduct internet searches related to Rodriguez's murder. Web pages found during those searches had been "deleted," but still existed on the hard drive.

6

During the search of defendant's residence, detectives also observed rims in the garage.

On October 5, 2007, the day police executed the warrant, Dalaza was taken into custody, transported to police headquarters, and interviewed by Sacramento Police Detective Michael Lange. During the interview, Lange made numerous false statements to Dalaza in an attempt to get him to open up. Among other things, Lange told him that a witness had identified him as the shooter from a photographic lineup, the gun found in defendant's home was the gun used in the murder although that had not yet been confirmed, and defendant implicated Dalaza as the shooter. Lange also explained that if convicted of Rodriguez's murder, Dalaza could receive the death penalty.

Thereafter, Dalaza told Lange that defendant had been angry about being shot two weeks earlier, wanted to get back at the shooter, and believed the shooter was a "Mexican dude" who drove a black Mustang. Defendant telephoned Dalaza on the night of the murder and asked him to go to Martin Luther King Jr. Boulevard to see if police were present. Dalaza also told Lange that defendant told him, "I got dude, I shot dude." Later, Dalaza said defendant told him, "Dude shot, dude dead." The day after the murder, defendant told Dalaza the man who was killed "wasn't the dude" that shot him and that "it was the wrong person." Dalaza had seen defendant with a gun approximately one month before the murder.

Dalaza generally matched the description of the shooter. Dalaza drove a white Buick LeSabre with tinted windows and shiny rims. He also drove defendant's car whenever he wanted. Dalaza used to have shoulder length hair and sometimes would pull it back. Dalaza smoked cigarettes; defendant did not. Dalaza had access to defendant's laptop and sometimes used it to search the internet. He also had access to defendant's closet and would sometimes borrow defendant's clothes. At trial, Dalaza admitted having a juvenile conviction for felony assault, and a prior conviction as an adult in 2006 for felony evasion of a peace officer.

One particle consistent with gunshot residue was found on the right front seat of defendant's Buick LeSabre, but the criminalist could not completely eliminate the possibility that the particle came from a different source.

Defendant did not testify on his own behalf at trial.

People v. Pulido, 2011 WL 3557019, at *1-5 (Cal. Ct. App. Aug. 11, 2011) (footnotes omitted).

*AEDPA Standards*

All of petitioner's claims were decided on the merits; therefore the AEDPA standards are in full play.

The statutory limitations of federal courts' power to issue habeas corpus relief for persons

7

1   in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

2   Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) provides:

3            An application for a writ of habeas corpus on behalf of a person in
             custody pursuant to the judgment of a State court shall not be
4            granted with respect to any claim that was adjudicated on the
             meritsin State court proceedings unless the adjudication of the
5            claim-

6            (1)     resulted in a decision that was contrary to, or involved an
                     unreasonable application of, clearly established Federal law, as
7                    determined by the Supreme Court of the United States; or

8            (2)     resulted in a decision that was based on an unreasonable
                     determination of the facts in light of the evidence presented in
9                    the State court proceeding.

10          As a preliminary matter, the Supreme Court has recently held and reconfirmed "that

11   § 2254(d) does not require a state court to give reasons before its decision can be deemed to have

12   been 'adjudicated on the merits.'"  Harrington v. Richter, 562 U.S. 86, 98 (2011).

13   Rather, "when a federal claim has been presented to a state court and the state court has denied

14   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

15   of any indication or state-law procedural principles to the contrary."  Id. at 99, citing Harris

16   v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear

17   whether a decision appearing to rest on federal grounds was decided on another basis).  "The

18   presumption may be overcome when there is reason to think some other explanation for the state

19   court's decision is more likely."  Id.

20          The Supreme Court has set forth the operative standard for federal habeas review of state

21   court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

22   application of federal law is different from an incorrect application of federal law.'"  Harrington,

23   supra, at 101, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).  "A state court's determination

24   that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

25   disagree' on the correctness of the state court's decision."  Id. at 101, citing Yarborough v.

26   Alvarado, 541 U.S. 652, 664 (2004).

27          Accordingly, "a habeas court must determine what arguments or theories supported or . .

28   could have supported[] the state court's decision; and then it must ask whether it is possible

1    fairminded jurists could disagree that those arguments or theories are inconsistent with the

2    holding in a prior decision of this Court." Id at 102.  "Evaluating whether a rule application was

3    unreasonable requires considering the rule's specificity.  The more general the rule, the more

4    leeway courts have in reaching outcomes in case-by-case determinations.'" Id.  Emphasizing the

5    stringency of this standard, which "stops short of imposing a complete bar of federal court

6    relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

7    cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

8    was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

9           The undersigned also finds that the same deference is paid to the factual determinations of

10   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

11   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

12   decision that was based on an unreasonable determination of the facts in light of the evidence

13   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in

14   §2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

15   factual error must be so apparent that "fairminded jurists" examining the same record could not

16   abide by the state court factual determination.  A petitioner must show clearly and convincingly

17   that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

18          The habeas corpus petitioner bears the burden of demonstrating the objectively

19   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

20   Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

21   court's ruling on the claim being presented in federal court was so lacking in justification that

22   there was an error well understood and comprehended in existing law beyond any possibility for

23   fairminded disagreement." Harrington, supra, at 102.  "Clearly established" law is law that has

24   been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S.

25   120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as

26   clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not

27   permitting state sponsored practices to inject bias into a criminal proceeding by compelling a

28   defendant to wear prison clothing or by unnecessary showing of uniformed guards does not

9

1    qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

2    The established Supreme Court authority reviewed must be a pronouncement on constitutional

3    principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

4    binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

5          The state courts need not have cited to federal authority, or even have indicated awareness

6    of federal authority in arriving at their decision.  Id. at 8.  Where the state courts have not

7    addressed the constitutional issue in dispute in any reasoned opinion, the federal court will

8    independently review the record in adjudication of that issue.  Independent review of the record is

9    not de novo review of the constitutional issue, but rather, the only method by which we can

10   determine whether a silent state court decision is objectively unreasonable."  Himes v.Thompson,

11   336 F.3d 848, 853 (9th Cir. 2003).

12         Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA

13   deference is given; the issue is reviewed de novo under general principles of federal law.

14   Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).  However, when a state court decision on a

15   petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

16   habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

17   merits.  Johnson v. Williams, __U.S.__ , 133 S.Ct. 1088, 1091 (2013).

18   *Standards for Ineffective Assistance of Counsel*

19         The clearly established federal law for ineffective assistance of counsel claims is

20   Strickland v. Washington, 466 U.S. 668 (1984).  To succeed on a Strickland claim, a defendant

21   must show that (1) his counsel's performance was deficient and that (2) the "deficient

22   performance prejudiced the defense."  Id. at 687.  Counsel is constitutionally deficient if his or

23   her representation "fell below an objective standard of reasonableness" such that it was outside

24   "the range of competence demanded of attorneys in criminal cases."  Id. at 687–88 (internal

25   quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a

26   fair trial, a trial whose result is reliable.'"  Harrington v. Richter, 562 U.S. at 104 (quoting

27   Strickland, 466 U.S. at 687).  A reviewing court is required to make every effort "to eliminate the

28   distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct,

1    and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 669.

2    Reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide

3    range of reasonable professional assistance." Strickland, 466 U.S. at 689.  There is in addition a

4    strong presumption that counsel "exercised acceptable professional judgment in all significant

5    decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S.

6    at 689).  This presumption of reasonableness means that the court must "give the attorneys the

7    benefit of the doubt," and must also "affirmatively entertain the range of possible reasons

8    [defense] counsel may have had for proceeding as they did." Cullen v. Pinholster, 563 U.S. 170

9    (2011) (internal quotation marks and alterations omitted).

10         Defense counsel has a "duty to make reasonable investigations or to make a reasonable

11   decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.

12   "A decision not to investigate thus 'must be directly assessed for reasonableness in all the

13   circumstances.'" Wiggins v. Smith, 539 U.S. 510, 533 (2003) (quoting Strickland, 466 U.S. at

14   691).  A reviewing court must "examine the reasonableness of counsel's conduct 'as of the time

15   of counsel's conduct.'" United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting

16   Strickland, 466 U.S. at 690).  See also Rhoades v. Henry, 638 F.3d 1027, 1036 (9th Cir. 2011)

17   (counsel did not render ineffective assistance in failing to investigate or raise an argument on

18   appeal where "neither would have gone anywhere").

19         Prejudice is found where "there is a reasonable probability that, but for counsel's

20   unprofessional errors, the result of the proceeding would have been different." Strickland, 466

21   U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

22   outcome." Id.  "The likelihood of a different result must be substantial, not just conceivable."

23   Richter, 562 U.S. at 112.

24         Under AEDPA, "[t]he pivotal question is whether the state court's application of the

25   Strickland standard was unreasonable." Id. at 101.  "[B]ecause the Strickland standard is a

26   general standard, a state court has even more latitude to reasonably determine that a defendant has

27   not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

28   ////

*Discussion*

A. <u>Admission of "False" Pre-Trial Identification Testimony- Claim 1</u>

Petitioner's entire premise is based upon the latest recantation of eyewitness Moore who was at the scene of the murder, who now says that petitioner was not the person he saw at the scene.  However, assuming the pre-trial identification picking petitioner as the culprit to have been knowingly false on the part of Moore, petitioner's claim must fail under AEDPA as no established Supreme Court authority permits such a due process claim unless the prosecution knew or should have known of the falsity—a fact conceded by all not to have been shown.

This recantation was not known on direct appeal.  Rather, it was first brought up in the first state habeas petition, the petition containing the expressed opinion presumably relied upon by the follow-up state courts.  The Superior Court found:

> Petitioner now presents a declaration of Bert Moore , who testified for the prosecution in petitioner 's trial, stating that he "feels bad" about identifying Petitioner as the person who shot Rodrigo Rodriguez , the murder victim.  Moore states that Petitioner was "not the man that [he] saw."  He explains that he selected Petitioner in the photo lineup because he looked like the person that he had previously selected, he wanted to identify the person the "police believed was the shooter because [he] wanted the police to stop bothering [him]," and was hoping for a reward. (Exhibit 1.)

> First, the language of the declaration is not entirely clear.  Although Moore denies that Petitioner was the person he saw, he does not expressly state that Petitioner was not the person that shot Rodriguez, apparently because Moore only saw the perpetrator before and after the shooting.

> Second, Moore's explanation for his false identification of Petitioner makes no sense, especially in light of the trial testimony.  He now claims that after selecting another person in a previous lineup, he chose Petitioner in part because he wanted the police to "stop bothering" him.  However, according to the testimony at trial, after being shown an initial lineup, he told his girlfriend that he really saw Petitioner and picked the wrong photo because he did not want to get involved.  It was only after the girlfriend contacted police that they came to re-interview Moore.  It makes no sense that Moore would have identified a random person in the first lineup, told his girlfriend (falsely) that it was Petitioner and that he did not want to be involved, then tell the police (falsely) that it was Petitioner because they were bothering him.  Third, although the other identifications were not as solid as Moore's, Petitioner acknowledges that he was identified to some degree as the person who shot Rodriguez or was near the shooting by over 10 witnesses.  One witness even "was able to positively identify defendant as the

12

shooter, stating she was 90 percent sure of her identification."
(*People v. Pulido* (Aug. 11, 2011, C062590) 2011 Cal.App.Unpub.
LEXIS 6095, at pp. 8-9.) In addition, Petitioner made incriminating
admissions to his cousin and the murder weapon was found in
Petitioner's locked bedroom approximately two weeks after the
murder. Petitioner suggests that Moore's identification was of
monumental importance because the prosecutor emphasized it
during closing argument and the jury asked for read back of the
audiotape of the interview in which Moore identified Petitioner.
However, the prosecutor also argued that other evidence showed
Petitioner was guilty, including proof defendant had a motive, the
means and opportunity, and lacked an alibi. Further  undermining
Petitioner's contention regarding the critical importance of Moore's
testimony to the prosecution's case is the fact the prosecutor
admitted there was an issue of whether or not Moore told the truth.
(Petition at p. 26.) Although Petitioner claims that the discovery of
the murder weapon in his room was equivocal because there were
no fingerprints on the weapon and his cousin, who generally
matched the description of the person who shot Rodriguez, also
lived in the same house, he has not attached any evidence that this
other person was actually responsible for  the shooting.  Finally,
Petitioner neglects to mention that, according to the trial record,
DNA evidence was recovered from the trigger of the firearm and
that Petitioner could not be excluded as a contributor of that DNA.
Given this evidence, Petitioner cannot establish that materially false
evidence was introduced at the trial.

ECF No. 2 at electronic pagination 34-40 (Superior Court Order)

Petitioner strongly argues that under state law the Superior Court was required to hold a

hearing, and could not decide the merits of the case from the record.  Having found no prima

facie case, the argument continues, it is presumed that the court assumed the truth of the new

evidence (the recantation), and was in error in not holding the hearing, making its ruling on all the

evidence presented.  Therefore, in conclusion, petitioner argues that this federal court must hold

an evidentiary hearing in which Moore comes to testify.

Respondent does not initially take issue with petitioner's argument, but rather asserts that

petitioner loses the entire claim because he seeks to apply a new rule of law in violation of

Teague v. Lane, 489 U.S. 288 (1989), and in any event, AEDPA's requirement that the law

applied be clearly established by the Supreme Court precludes cognizance of the claim.  For the

reasons expressed below, respondent is correct with respect to the AEDPA contention.[1]

---

[1]  Although generally, the court should determine whether the rule to be applied is a "new rule,"
pursuant to Teague v. Lane, that will not be done here.  A rule of law is not "new, " if it was

1       The undersigned assumes for the purpose of AEDPA application that the Moore

2   recantation proves the "false evidence" of his pretrial identification, as ultimately supplemented

3   by his testimony elicited by the prosecution."[2]  Petitioner relies on circuit precedent which does

4   not require an element of prosecutorial knowledge with respect to the submittal of false evidence.

5   See  Maxwell v. Roe, 628 F.3d 486, 506-07 (9th Cir. 2010) ("[A] defendant's due process rights

6   were violated ... when it was revealed that false evidence brought about a defendant's

7   conviction."); Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) ("[W]e assume without

8   deciding that the prosecutor neither knew nor should have known of Masse's perjury about his

9   deal.  Thus our analysis of the perjury presented at Killian's trial must determine whether there is

10  a reasonable probability that without all the perjury the result of the proceeding would have been

11  different.") (citation, internal quotation marks, and brackets omitted), cert. denied, 537 U.S. 1179

12  (2003); Hall v. Director of Corrections, 343 F.3d 976, 984 n.8 (9th Cir. 2003) (per curiam)

13  (holding that use at trial of jailhouse notes, subsequently proven to have been altered from their

14  original state without knowledge of the prosecutor, violated defendant's right to due process;

15  "Where there are real, credible doubts about the veracity of essential evidence and the person who

16  created it, AEDPA does not require us to turn a blind eye.").

17      However, the Supreme Court, when specifically discussing the presentation of false

18  evidence has always required the knowing involvement of the prosecution in the presentation of

19  false evidence.  Napue v. Illinois, 360 U.S. 264, 269 (1959) (either the actual solicitation by the

20  

21  dictated by "precedent," at the time petitioner's conviction was final, *and that such precedent
    may be circuit precedent.*  However, the Supreme Court has strongly admonished that circuit

22  precedent is *not to be utilized* in cases controlled by AEDPA deference.  The Ninth Circuit has
    held in some cases that no prosecutorial involvement in the submission of false evidence be

23  established; see petitioner's cited cases discussed *infra* in the text.  Thus, it is possible that the
    Teague outcome would ultimately favor petitioner.  Nevertheless, for the reasons discussed in the

24  text, petitioner's argument founders on AEDPA principles.  Moreover, as respondent has pointed
    out in his cited cases in the text, the Ninth Circuit simply has not spoken with a consistent voice

25  in terms of whether prosecutorial involvement is necessary.  The undersigned will not launch off
    in a lengthy Teague analysis, when the ultimate result in any event is directed by AEDPA.

26  [2]  False evidence, in the *federal due process context*, should be distinguished from disputed

27  evidence which may have ultimately been determined as incorrect, which appears to be the state
    law standard.  False evidence connotes a purposeful falsification, i.e., the knowing submission of

28  evidence known to be incorrect by the prosecution at the time it was submitted.

1  prosecution, or with its "connivance"); <u>Hysler v. State of Florida</u>, 315 U.S. 411, 413 (1942)

2  ("Mere recantation of testimony" does not justify voiding a conviction on due process grounds).

3  The undersigned cannot find a holding of the Supreme Court which dispenses with the

4  prosecutorial involvement requirement.[3]  In addition, numerous cases from the same Ninth

5  Circuit *have* required the prosecution involvement evidence when determining the propriety of

6  false evidence in an AEDPA context.

> To prevail on a due process claim based on the presentation of false
> evidence, a petitioner must show "that (1) the testimony (or
> evidence) was actually false, (2) *the prosecution knew or should
> have known that the testimony was actually false,* and (3) ... the
> false testimony was material." *Hayes v. Brown,* 399 F.3d 972, 984
> (9th Cir.2005) (en banc) (quoting *United States v. Zuno–Arce,* 339
> F.3d 886, 889 (9th Cir.2003)).

11  <u>Jones v. Ryan</u>, 691 F.3d 1093, 1102 (9th Cir. 2012) (emphasis added).  <u>See</u> <u>also</u> <u>Morales v.</u>

12  <u>Woodford</u>, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The due process requirement voids a

13  conviction where the false evidence is 'known to be such by representatives of the State.'

14  [Footnote omitted.] *The essence of the due process violation is misconduct by the government,*

15  *not merely perjury by a witness.*") (emphasis added).

16          However, the question here is not what set of Ninth Circuit precedents should be

17  followed, but rather, whether a holding of the Supreme Court has permitted the less onerous

18  standard of no government involvement needed when the issue is submission of false testimony

19  or evidence.  The Supreme Court has admonished the Circuits in the most strident terms possible

20  that circuit authority has no place in the AEDPA analysis.

> When a state prisoner seeks federal habeas relief on the ground that
> a state court, in adjudicating a claim on the merits,  misapplied
> federal law, a federal court may grant relief only if the state court's
> decision was "contrary to, or involved an unreasonable application
> of, clearly established Federal law, as determined by the Supreme
> Court of the United States." 28 U.S.C. § 2254(d)(1). We have
> emphasized, time and again, that the Antiterrorism and Effective

---

[3]  Petitioner's cited cases include discussion of <u>Brady</u> and <u>Giglio</u> for the proposition that
suppression of material evidence favorable to petitioner is actionable despite the "good or bad
faith" of the prosecution.  However, not only is the prosecution (broadly defined) involved in the
suppression in some way in either case, these cases do not supplant Supreme Court authority on
the precise issue here—the solicitation by, the prosecution, or knowing acquiescence in, false,
i.e., perjurious, evidence.  Clearly, <u>Brady</u> and <u>Giglio</u> do not purport to overrule or modify <u>Napue</u>.

1
2
3
4
5

Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is "clearly established." *See, e.g., Marshall v. Rodgers*, 569 U.S. ——, ——, 133 S.Ct. 1446, 1450–1451, 185 L.Ed.2d 540 (2013) ( per curiam). Because the Ninth Circuit failed to comply with this rule, we reverse its decision granting habeas relief to respondent Marvin Smith.

6
7
8
9
10
11
12
13

\*\*\*

The Ninth Circuit did not purport to identify any case in which we have found notice constitutionally inadequate because, although the defendant was initially adequately apprised of the offense against him, the prosecutor focused at trial on one potential theory of liability at the expense of another. Rather, it found the instant case to be "indistinguishable from" the Ninth Circuit's own decision in *Sheppard v. Rees*, 909 F.2d 1234 (1989), which the court thought "faithfully applied the principles enunciated by the Supreme Court." 731 F.3d, at 868. The court also rejected, as an "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), the California Court of Appeal's conclusion that preliminary examination testimony and the jury instructions conference put respondent on notice of the possibility of conviction on an aiding-and-abetting theory. *See id.*, at 871–872.

14

\*\*\*

15
16
17
18
19
20
21
22
23

Because our case law does not clearly establish the legal proposition needed to grant respondent habeas relief, the Ninth Circuit was forced to rely heavily on its own decision in *Sheppard, supra*. Of course, AEDPA permits habeas relief only if a state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law" as determined by this Court, not by the courts of appeals. 28 U.S.C. § 2254(d)(1). The Ninth Circuit attempted to evade this barrier by holding that *Sheppard* "faithfully applied the principles enunciated by the Supreme Court in *Cole*, *Oliver*, and *Russell*." 731 F.3d, at 868. But Circuit precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." *Marshall*, 569 U.S., at ——, 133 S.Ct., at 1451. *Sheppard* is irrelevant to the question presented by this case: whether our case law clearly establishes that a prosecutor's focus on one theory of liability at trial can render earlier notice of another theory of liability inadequate.

24

Lopez v. Smith, __U.S.__, 135 S.Ct. 1, 1-2 (2014).

25

All of petitioner's cases pre-date Lopez, and are inconsistent with its directive.  Indeed,

26

Hall simply applied circuit precedent and found that AEDPA did not require the allowance of

27

false evidence regardless of the prosecution's knowledge.  There was no discussion of whether its

28

holding was directed by established Supreme Court precedent.  Killian and Maxwell found that

16

for one reason or another the factual findings of the state court to be "unreasonable," and hence AEDPA deference on the ultimate legal issue was not warranted.  However, <u>Lopez</u> also spoke to this situation.

> The Ninth Circuit also disagreed with what it termed the state court's "determination of the facts"—principally, the state court's holding that preliminary examination testimony and the prosecutors' request for an aiding-and-abetting jury instruction shortly before closing arguments adequately put respondent on notice of the prosecution's aiding-and-abetting theory.... The Ninth Circuit therefore granted relief under § 2254(d)(2), which permits habeas relief where the state-court "decision ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." That holding cannot be sustained.
>
> ***
>
> Although the Ninth Circuit claimed its disagreement with the state court was factual in nature, in reality its grant of relief was based on a legal conclusion about the adequacy of the notice provided. The Ninth Circuit believed that the events detailed above, even when taken together with the information filed against respondent, failed to measure up to the standard of notice applicable in cases like this. That ranked as a legal determination governed by § 2254(d)(1), not one of fact governed by § 2254(d)(2). But, as we have explained, the Ninth Circuit cited only its own precedent for establishing the appropriate standard.

<u>Lopez</u>, 135 S.Ct. at 5.

Here the situation is no different.  Petitioner urges that no section 2254(d)(1) deference is due because the state court was unreasonable in not holding an evidentiary hearing on the merits of the alleged falsity, and basing its ruling on the record evidence.  However, the lack of knowledge of the prosecution in submitting false evidence was a conceded fact and/or immaterial to the state courts.  It would be the ultimate in bootstrapping to find that a Supreme Court required element of a legal claim, here prosecution involvement, was inapplicable in the AEDPA context because of alleged state court factual finding improprieties on *other* elements of the claim.  <u>Lopez</u> directs that no such bootstrapping be permitted.

Moreover, petitioner's ultimate objection is that the Superior Court got the legal question wrong--, i.e., that it could not but find legal error assuming the truth of the recanted testimony as it was assertedly required to do under state law.  Petitioner asserts that the trial court's

17

1   examination of the record to arrive at its "no error" conclusion was wrong.  Nevertheless, this

2   court does not stand to correct errors of state law, procedural or otherwise, and the Superior

3   Court's ultimate conclusion that no *prima facie* case was stated is a *legal* conclusion.

4   Thus, petitioner's cited cases are inapplicable.  Petitioner strongly argues that the

5   undersigned should not be "mutinous," and that Ninth Circuit precedent must be followed unless

6   and until the Supreme Court says otherwise.  Aside from begging the issue of which Ninth Circuit

7   precedent should be followed, the argument actually compels the result adverse to petitioner.  It is

8   one thing to buck Ninth Circuit precedent in fashioning one's own rule on the substantive issue

9   based on one's interpretation of Supreme Court precedent; it is quite another to ignore the express

10  directives of the Supreme Court to not apply the circuit precedent.  In this latter situation, it would

11  be mutinous indeed to ignore the express directive of the nation's highest court.

12  Because the non-application of circuit precedent is required, and because the lack of

13  prosecution involvement in the submission of allegedly false evidence is conceded herein, the

14  undersigned will not make an alternative factual analysis on the need for a federal evidentiary

15  hearing to review the merits of the falsity claim, i.e, whether Moore is now telling the truth.

16  Petitioner's false evidence claim should be denied as it lacks a Supreme Court required element,

17  prosecutorial involvement in the submission of false evidence.

18  B. The Cell Phone Claims- Claims 2-6

19  *Overview*

20  Several claims by petitioner involve the use by the prosecution of cell phone location

21  records to show that petitioner was in the general area of the murder at its approximate time.  This

22  was important evidence because of the conflicts in eyewitness identification, and petitioner had

23  no known other business in the victim's area on the murder day.  Petitioner raises several types of

24  challenges, most of them ineffective assistance of trial and appellate counsel in not objecting, or

25  timely objecting, to the cell phone evidence, and in failing to acquire support for a challenge to

26  the cell phone evidence.  One claim directly challenges the admission of cell phone location

27  evidence.

28  However, none of the challenges can be maintained for the reasons set forth below.

18

*Facts*

Both parties give accurate renditions of the facts, and the undersigned will use their statements by placing them in blocked quotes.  Where the undersigned makes additions from the record or judicial notice, or commentary in general, such will be italicized.

Defense counsel was not oblivious to the significance of the cell phone records.  However, as the facts below show, he made no sustained effort to challenge the facts or the primary witness relating the facts.  Rather, counsel made sporadic thrusts to keep the evidence out.  The first such attempt occurred pretrial in the form of what is known in federal court as a <u>Daubert</u> hearing; however, its not altogether similar counterpart in state law is made pursuant to <u>People v. Kelly</u>, 17 Cal. 3d 24 (1976), i.e., the proponent of "new technology" for use in court has the burden of demonstrating the reliability of that technology through an expert.

1.  The Pre-Trial <u>Kelly</u> motion

Pulido's trial counsel sought "to exclude expert testimony regarding the use of cellular towers to establish location pursuant to Evid. Code § 801(b)." (CT 1106-07) Specifically citing the rule of *People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144 (1976), counsel contended that the use of radio frequencies to pinpoint the location of a caller is a new scientific technique that could only be placed before the jury if proven sufficiently reliable. (CT 1117-18) He requested a hearing "to determine whether such technology is in fact accepted by the relevant scientific community as reliable." (CT 1119)

The prosecution argued that Pulido was not entitled to a *Kelly* hearing because the defense had "submitted no affidavits, no scientific literature, and no case authority showing that anyone believes" that the locating technology was new or novel. (CT 1234) The trial court denied the request for a *Kelly* hearing, first stating:

> My concern is the extrapolation of *Kelly-Frye* to a circumstance and a set of information that I'm – my initial inclination is that it's not triggered in terms of when you move from a land line, and AT&T goes from a land line to a fiber optic, and how they [billed] their clients based upon the line that was transmitted.  Again, I'm not here to deal in hypotheticals.  Again, I'm not here to theorize about what may or may not come within the *Kelly* rule or a slopeafter that.

(RT 145)

The court, after giving the matter more thought, affirmed its initial inclination:

> I do believe that the methodology and technology is not new, thereby triggering the *Kelly* rule. The issues raised go to the weight of the opinion, in my opinion are sufficiently addressed during the course of cross-examination.

(RT 205)

Petitioner's Memorandum, ECF No. 26 at 33-34.

*Petitioner's trial counsel argued vigorously to have the court order a hearing outside of the jury to test the reliability of using cell phone records to give approximate location. At one point he argued (apparently without evidentiary backup) that "we believe the science might show that a cell doesn't always ping off the closest cell tower." (RT 136)*

2.  The Testimony of the Service Provider's Custodian of Records

The lone witness who presented testimony at trial regarding the use of cell towers to locate a cellphone was the custodian of records of Metro PCS, Larry Smith, who had been employed by the company for a year and one-half prior to his testimony. (RT 635)The trial court permitted trial counsel to voir dire Smith. (RT 636-37) Counsel elicited from him that he held no degree in radio technology and, indeed, had no college degree at all. (RT637).  It was his employer who taught him about radio technology; he was trained by the "qualified engineers" who built the cell towers. (RT 638) Smith conceded that he was never qualified as an expert on the hundred or so previous occasions he testified in court; he, rather, had appeared, as he was doing in this case, simply as the company's custodian of records. (RT 636, 639)  When, following his voir-dire examination of Smith, trial counsel stated his belief that Smith was not qualified to testify as an expert on radio frequency and technology, the court, accurately enough, responded that the prosecution had not offered him as such. (RT 639) Counsel left it at that.

Smith testified that, when a cellphone in a vehicle is attempting to make a call, it "searches out the nearest available tower with the strongest signal, which is the

tower it will connect to." (RT 640) He stated that a "cell tower has a specific range, typically in a city such as Sacramento, [of] one and a half, two miles." (RT 640-41) Asked whether Pulido's cellphone records (Trial Ex. 160) are the sorts of records that Metro PCS employees rely on, Smith said that they were (RT 644). He was not asked, and did not state, for what purposes such employees rely on these records.

Smith explained that the cellphone records indicate the tower and the antenna with which the cellphone is connected on individual calls. (RT 647)  Going through selected calls, the prosecutor asked questions such as, at the specified time, "where is our target at? What tower is it next to?" (RT 656), "what tower is he now next to?" (RT 658), "where is our target number located at?" (RT 659), "at the time of that call, where is our target number located?" (RT 660)  In response, Smith would read out the tower numbers indicated in the records.

Smith noted that the first call that bounced off Tower 47 on the day of the murder was made at 4:20:51 p.m. (RT 661) (the murder took place at approximately 6:39 p.m.). He then explained that, since the antenna at Tower 47 is identified, one can determine the direction that the phone is at in relation to the tower. (Id.) This information enabled one to identify a "sector" in which the phone is located, based on the range of the tower and the direction indicated by the antenna. (RT 653-54)

Petitioner's Memorandum, ECF No. 26 at 34-35.

However, this witness did not testify that the location recordation of a user's cell phone was **always** proximate to the nearest tower: "What the cell phone does is, as I stated, searches for the nearest available tower with the strongest signal.  Now, if the nearest available tower is 150 yards away, it may be full[y utilized].  In that case, it will search the remainder of the network—as you see there, several towers—and find which one has the strongest signal and connect to it as long as it's available."  (RT 640)

21

***

*"If it's (the closest tower ) is receiving a lot of calls, like I said, it has a specific number of calls each tower can handle.  Once that is maxed out, when the next incoming call is coming in, our person is trying to make a phone call, it connects to our network, not just one tower.  And the network—the towers talk to each other basically and determine who has the strongest signal and who [which tower]is available at that time.  (RT 675)*

*Tower 47's location was described as Franklin Blvd., RT 642—the relatively approximate site of the murder. Tower 29 was located on Rose Bud Lane, id., proximate to petitioner's half-brothers residence.  The undersigned can take judicial notice of Google Maps to state the approximate locations and distances involved.  The tower on Franklin (South Sacramento just past 20th Ave) is approximately 14 miles distant as one would drive, fairly directly,  from the tower on Rose Bud Lane (North Sacramento just north of Auburn Blvd.  The Franklin tower is in the neighborhood of 5-6 blocks west of Martin Luther King Blvd.  The undersigned understands the testimony regarding cell phone location to mean that a "target" phone may be identified as being within a pie shaped wedge, a "sector" much like a pennant, whose tip is at the tower and whose widest spot is up to 1-2 miles maximum away from the tip.  Of course, many variables, including topography and obstructions can affect the shape of this wedge sector.*

In a city like Sacramento, towers typically have a range of a mile and a half to two miles. (Id. at 641, 673-74.)  The towers are set to receive signals from a specific coverage area.  (Id. at 674.)

The records for Petitioner's phone showed the following: On September 16, 2007 (the day Rodriguez was murdered),  Petitioner's cellphone made or received calls at 10:28 a.m., 10:29 a.m., 11:43 a.m., 12:11 p.m., 12:24 p.m., 3:01 p.m., 3:28 p.m., and 3:29 p.m.  In each of those calls, Petitioner's signal connected with Metro PCS's tower 29, located at 5831 Rose Bud Lane. (4 RT 642, 651-57.)

Petitioner's phone also made and or received calls at 3:30, 3:32, 3:35, 3:36, 3:38, 3:41, and 3:47 p.m. (4 RT 657-60.) For the calls at 3:30, 3:35, 3:36, and 3:38, Smith was not asked which tower they connected with. (Id. at 657-58.)  The other calls, including the 3:47 call, still connected with tower 29. (Id. at 657-60.)

22

At 4:17 p.m., someone called Petitioner, and the call went directly to his voice mail. Petitioner's cellphone made or received more calls at 4:20, 4:22, 4:40, 4:46, 4:48, 5:44, and 5:47p.m. (4 RT 642, 660-65.) For all of these calls, Petitioner's cellphone connected with tower 47,which was located at 4250 Franklin Boulevard. (Id. at 642, 660-65.)  At 5:56, someone called Petitioner's cellphone, but Petitioner's phone did not connect with any tower, which indicated he was not receiving a signal. This might occur if the cellphone were located in an area with no reception, or it had been turned off. (Id. at 649-50, 664-65.)

After the call at 5:47 p.m., one and one-half hours passed before Petitioner's cellphone made or receive any more calls. The activity resumed at 7:20 p.m., when his phone placed a call.  (4 RT 664-65.) That call connected again with tower 29 on Rose Bud Lane. (Id. at 665.) That night, Petitioner's phone made or received calls at 8:28, 9:42, 9:49, 9:54, 10:18, and 11:58. They all connected with tower 29. (Id. at 665-69.)

Answer, ECF No. 31 at 49-50.

Trial counsel called no witness of his own, expert or otherwise, to counter the Smith testimony. It stood unrebutted.  Indeed, in closing argument, counsel adopted Smith's fundamental premise, namely, that a cellphone had to be within two miles of the single tower identified in the phone records. (RT 2900-01)

Petitioner's Memorandum, ECF No. 26 at 35.

3. The Schenk Declaration (Submitted with Petitioner's Superior Court Habeas Petition)

Manfred Schenk is a telecommunications scientist with an expertise in networks. (Doc. 3,Ex. 10 (Schenk Decl.) at ¶¶ 1, 3.)  He has been qualified to testify as an expert in cell-tower tracking on approximately twenty occasions. (Id. at ¶ 7.)  In his expert opinion, "single-tower methodology" – that is, the technique employed in Pulido's case of inferring the location of a cellphone, at least within a certain area, based solely on the identification of a single cell tower associated with a

23

particular call – "is not scientifically valid or reliable in its forensic application."

Schenk reported that single-tower methodology has never been scientifically validated and is not the product of any scientific consensus. (Doc. 3, Ex. 10 at ¶ 8.) He averred that "the essential assumption underlying single-tower methodology – that the primary factor upon which the utilization of a particular cell-phone tower depends is the distance between the cellular handset and cellular tower – is without foundation, and transparently erroneous." (Id. at ¶ 10.)

Schenk explained that cell-tower selection by a service provider is made, not based on proximity, but on the needs of the provider's network at any given time.  (Doc. 3, Ex. 10 at ¶¶ 10-11.)  The providers utilize computers, employing confidential algorithms, to constantly balance the large number of calls being processed across the number of towers in the system, and the computer "makes its tower selections based on the then-current, and anticipated, network activity, not on the proximity of a handset to a tower," in order to ensure a network balance.  (Id. at ¶ 11.)  The system does not route a cell-phone's signal to the nearest tower even as an initial matter. (Id. at ¶ 12.)

Schenk also stated that, had trial counsel consulted with him in this case, he would have been willing to testify at both a Kelly hearing and at trial, "to expose what [he] strongly believe[s] to be the junk science underlying single-tower methodology and to correct the false impressions its use creates, as, indeed, ultimately occurred in Mr. Pulido's trial."  (Doc. 3, Ex. 10 at ¶ 16.)

Turning to the specifics of Smith's testimony, Schenk took great issue with its most critical portions.  Responding to Smith's assertion that a cell phone in a vehicle "searches out for the nearest available tower with the strongest signal, which is the tower it will connect to," effectively the linchpin for the prosecution's use of his testimony, Schenk asserted, simply enough, "This is false." (Id. at ¶ 17(b).)  He explained that a tower assignment is "based on the balancing needs of the network and a host of non-proximity factors." (Id.)

1   Responding to Smith's generic assertion that his company's employees rely on the

2   records he was interpreting for the jury, Schenk replied that, though they may well

3   rely on such records for various purposes, they do not do so "for the purpose to

4   which they were put at Mr. Pulido's trial, namely, to identify the location of a cell

5   phone."  (Doc. 3, Ex. 10 at ¶ 17(d).)  As to Smith's assertion that a cellphone must

6   be within two miles of the tower identified in the cellphone records because that is

7   the tower's range, another critical aspect of his testimony for the prosecution's

8   purposes, Schenk responded, in unqualified language, that that assertion "is,

9   categorically, false." (Id. at ¶ 17(e).) He explained that service providers could not

10   limit the range of their towers in that manner even if they wanted to, which they do

11   not. (Id.)

12

13   Petitioner's Memorandum, ECF No. 26 at 35-37.

14       *The Shenck declaration is notable for what it does not contain.  First, although*

15   *Mr. Shenck  concludes that there is no consensus concerning cell phones initially*

16   *attempting to communicate off the nearest tower, the declaration contains no citation to*

17   *contrary authority.  And as set forth in the discussion below, the vast majority of case*

18   *authority, at the very least, has accepted the "closest cell tower when available" theory.*

19

20       *Next, although it is undisputed that a cell phone may not invariably communicate with the*

21   *closest cell tower, the Schenk declaration gives no indication why a cell phone would not*

22   *logically seek out, at least initially, the strongest tower signal.*

23       *Finally, the Schenk declaration does nothing to rebut the inferences to be drawn utilizing*

24   ***all** the relevant calls.  That is, the Shenck declaration may be persuasive for a single cell phone*

25   *call in the abstract, but it  says nothing about why petitioner's cell phone kept pinging off the*

26   *tower most proximate to the murder site, and no other, at times relatively proximate to the*

27   *murder, only to never ping off that same tower some time before and after the murder.  The*

28   *Shenck declaration would lead one to believe that petitioner is simply unlucky in the extreme.*

25

1 | *Moreover, the Shenck declaration gives no indication why, if petitioner were far away from the*

2 | *murder site, especially near his relatives' residence, other closer towers were always bypassed at*

3 | *or about the time of the murder to connect every time with a far distant tower—perhaps even out*

4 | *of range entirely.*

5 | *Discussion*

6 | Petitioner raises several ineffective assistance of counsel claims, both trial and appellate,

7 | but they all revolve around the asserted failure to investigate and obtain expert advice regarding

8 | the connectivity technology of cell phones.  One sub-claim asserts a failure to object to the

9 | improper expert testimony of the cell phone company custodian of records.  Finally, petitioner

10 | asserts a due process "false testimony" claim, i.e., the allegedly incorrect testimony of the

11 | custodian of records.

12 | 1.  The Ineffective  Assistance of Counsel Claims

13 | Petitioner has not demonstrated that the state court's habeas determinations were

14 | unreasonable in either respect, nor is he entitled to an evidentiary hearing to prove the correctness

15 | of the Shenck declaration.  The undersigned *emphasizes that he is not making a factual finding of*

16 | *incorrectness of the Shenck expert declaration*; rather, for the reasons set forth below, he is

17 | simply finding that the state courts in petitioner's case were not unreasonable in relying upon the

18 | vast amount of authority at odds with the Shenck declaration in finding the actions of counsel

19 | reasonable.

20 | At hearing the undersigned inquired of petitioner's counsel whether trial counsel was

21 | ineffective because he did not find Mr. Shenck to testify for the defense.  The answer was

22 | insightful in that although petitioner's counsel did not adopt the court's question as his position,

23 | petitioner's counsel was not able to point to any authority cited in the Shenck declaration, much

24 | less overwhelming authority,— or even authority outside the declaration with the exception of

25 | one case, post-petitioner trial,[4] disputing cell site location accuracy--something the undersigned

26 | would have expected if all defense counsel are to be determined to be unreasonable in

27 |

28 | [4]  <u>United States v. Evans</u>, 892 F. Supp. 2d 949 (N.D. Ill. 2012).

1    acquiescing to cell site location evidence placing their clients in the approximate area of a crime.

2         To the contrary, as Respondent has noted, the vast amount of case authority, even recent

3    authority, both within and without California, would not place reasonable counsel on notice of a

4    deficient advocacy if they did not vigorously seek to keep out such evidence.[5]

5    People v. Martin, 98 Cal. App. 4th 408, 414 (2002) (prosecution relied on cell phone location data

6    without apparent objection); People v. Vu, 143 Cal. App. 4th 1009, 1017 (2006) (prosecution

7    relied on cell phone location data without apparent objection) ;People v. Thomas, 2015 WL

8    2105729 (Cal. Ct. App. 2015) (citing a large amount of authority, and denying "as futile"

9    ineffective assistance of counsel claim for failure to challenge closest tower cell phone location

10   evidence in a Kelly hearing); People v. Legardy, 2014 WL 411282 (Cal. Ct. App. 2014) (allowing

11   a cell phone custodian of records or other employee to testify to nearest tower cell phone location

12   evidence); People v. Landers, 2011 WL 2811334 (Cal. Ct. App. 2011) (allowing a cell phone

13   custodian of records or other employee to testify to nearest tower cell phone location evidence);

14   People v. Love, 2010 WL 5407352 (Cal. Ct. App. 2010) (Metro PCS employee, without apparent

15   objection, testified to the fact that 99.99 percent of cell phone contact is with the closest tower);

16   People v. Wells, 2007 WL 466963 (Cal. Ct. App. 2007) (not error to deny Kelly hearing

17   regarding cell phone location testimony, and citing in footnote 11 numerous out of jurisdiction

18   cases); People v. Jiminez, 2007 WL 215075 (Cal. Ct. App. 2007) (not error to deny Kelly hearing

19   regarding cell phone location testimony); United States v. Graham, 796 F.3d 332, 364 (4th Cir.

20   2015) ("…a cell phone connects to the cell tower emitting the strongest signal, and that cell sites

21   in urban areas have a two mile maximum ranger of connectivity.  He testified further that, aside

22   from proximity, factors such as line of sight and volume of call traffic may affect the ability of a

23   particular cell tower to connect to a phone, but, in any case the phone must be located within two

24   miles of any cell tower in the Baltimore area in order to connect to it.")  United States v. Ransfer,

25

26   [5]  The undersigned will cite herein unpublished California authority amongst other cases.  Of
     course, the California unpublished authority is not cited for precedential value, but is cited for the
27   purpose of demonstrating what reasonable counsel would be aware of in terms of cell phone
     forensic practice, and the lack of prejudice in the Strickland sense given how courts would
28   probably adjudicate the issue.

749 F.3d 914 (11th Cir. 2014) (Custodian of records OK to talk about cell phone pinging to nearest tower. Id. at 937-938; "Detective Christy… explained…The cell phone will "ping" the nearest tower unless it is at capacity, in which case it will ping the next available tower. Accordingly, the cell phone tower records are an approximation of the phone's location at the time of the call." Id. at 931, n. 18).  United States v. Davis, 785 F. 3d 498, 501-02 (11th Cir. 2015):

> The testimony tells us (1) the cell tower used will typically be the cell tower closest to the user, (2) the cell tower has a circular coverage radius of varying sizes, and (3) although the tower sector number indicates a general direction (North, South, etc.) of the user from the tower, the user can be anywhere in that sector. Despite this lack of precision as to where Davis's cell phone was located, the cell tower evidence did give the government a basis for arguing calls to and from Davis's cell phone were connected through cell tower locations that were near the robbery locations, and thus Davis necessarily was near the robberies too.

In re Application of the United States for Historical Cell Site Data ("In re Application (Fifth Circuit)"), 724 F.3d 600, 611–15 (5th Cir.2013):

> A cell service subscriber, like a telephone user, understands that his cell phone must send a signal to a nearby cell tower in order to wirelessly connect his call. See United States v. Madison, No. 11–60285–CR, 2012 WL 3095357, at *8 (S.D.Fla. July 30, 2012) (unpublished) ('[C]ell-phone users have knowledge that when they place or receive calls, they, through their cell phones, are transmitting signals to the nearest cell tower, and, thus, to their communications service providers.')

Id. at 613.

United States v. Banks, __F. Supp. 3d__, 2015 WL 751953 (D. Kan. Feb. 23, 2015):

> The proposition that a cell phone tower will connect to the nearest tower is not always correct.  Because a phone selects a tower based on signal strength, any factor that affects signal strength can influence whether a phone receives a signal from the nearest tower.…But while acknowledging that non-distance factors can influence which tower a cell phone uses, Mr. Pope nonetheless maintained that there was a 'very high probability' a phone would connect to the nearest tower."

Id. at *6 (issue decided in government's favor by the court after hearing with conflicting experts).

In re Application for Telephone, etc., __F.Supp. 3d__, 2015 WL 4594558, at *1  (N.D.Cal. Jul.

29, 2015) ("Whenever a cell phone makes or receives a call, sends or receives a text message, or otherwise sends or receives data, the phone connects via radio waves to an antenna on the closest cell tower, generating  CSLI").  United States v. Machado-Erazo, 950 F.Supp. 2nd 49, 56, 58 (D.DC. 2013) (rejecting Evans and finding the relevance of cell phone location testimony demonstrating the general location of a call).[6]

Again, the point of citing all this authority is not to find Mr. Shenck presently incorrect; it is to find that reasonable counsel could rely on opposite authority in forming trial strategy not to support the relatively unsupportable, and that in any event, most courts would find a lack of prejudice.  Each of petitioner's several ineffective assistance claims fails before this authority.  The failure to support a Kelly motion may well have been reasonable in that any evidentiary contest was sure to be met with a blizzard of authority to the opposite conclusion.  It is certainly not unheard of that defense counsel will attempt a stab-in-the-dark motion on the off chance that good will come of it, and there is no downside for having tried.  The related claim of failing to find an expert to rebut the state reliance on cell phone tower proximity evidence also fails as counsel does not have a duty to scour the country for expert evidence in the face of  massive contrary authority.

This case is indistinguishable in principle from Maryland v. Kulbicki, __U.S.__, __S.Ct.__, 2015 WL 5774453 (Oct. 5, 2015).  In that case, counsel was faulted for not recognizing, investigating and supporting a ballistics theory that had become scientifically discredited since the time of trial.  Further, there was assertedly some nascent evidence that the theory was unreliable even at the time of trial which counsel should have pursued.  The Supreme Court refused to fault counsel, however, for not investigating and pursuing the counter-evidence

---

[6]  Even most tech websites endorse the fact that a cell phone generally connects to the nearest tower.  See e.g., "When you chat with your friend on your cell phone, your phone converts your voice to an electrical signal, which is then transmitted via radio waves to the nearest cell phone tower."  Rong Wang, PhD, December 20, 2014, Pong, How Do Cell Phones Work?
 "Regular mobile phones and smartphones connect to the nearest cell phone tower in order to get reception." Kwan, Cell Phone Tower Locations, http://cellphones.lovetoknow.com.
But see Douglas Starr, What Your Cellphone Can't Tell the Police, newyorker.com (New Yorker Magazine), June 26, 2014 (very similar to the content of the Shenck declaration).

1    to a widely accepted theory at the time of trial.  The outcome in petitioner's case should be even

2    more clear in that the cell tower proximity theory was the vastly predominant theory at the time of

3    his trial, and remains so to this day.  The Superior Court and later appellate courts were simply

4    not AEDPA unreasonable in concluding that counsel was reasonable in not pursuing a relatively

5    novel attack on the theory that cell phones usually utilize the nearest cell tower.

6            Finally, just as in <u>Kulbicki</u>, the undersigned need not launch off on an inquiry concerning

7    whether the Shenck theory casting the cell tower proximity theory as junk science is now correct,

8    i.e., that petitioner was prejudiced.  The first prong of <u>Strickland</u> has not been met.

9            Counsel also posits that counsel was ineffective for not objecting to the cell phone

10   custodian of records testimony regarding the tower to which petitioner's cell phone was (most

11   probably) connecting at various times on the murder day.  The problem with this attack is that as

12   respondent has set forth, defense trial counsel did interpose such an objection.

> When Smith first took the stand, the prosecutor showed him Exhibit 157, a
> diagram illustrating how an individual cellphone connects with the cellular
> provider's network.  (4 RT 636, 639-41.) When the prosecutor asked Smith if the
> diagram would help him explain the principles underlying cellphone technology,
> Johnson requested permission to examine Smith on voir dire concerning his
> qualifications to testify about cellular technology. The court granted the
> request, and Johnson examined Smith on voir dire. (Id. at 636-37.) During the voir
> dire, Smith testified that he had received formal training on radio technology from
> Metro PCS, including "[c]lassroom style training"; "one-on-one training"; "hands-
> on training"; instruction by qualified Metro PCS engineers, including engineers
> who had built the company's cell towers; and instruction from Metro PCS
> supervisors who themselves had taken various courses in radio
> technology. (<u>Id.</u> at 637-38.)
>
> After the voir dire, Johnson objected to the publication of Exhibit 157. He argued
> that Smith was "not qualified to speak as an expert regarding radio frequency and
> technology." (4 RT 639.) The court said it was not under the impression Smith was
> being offered as an expert. The parties approached the bench, and the court held an
> unreported conference. It then overruled the objection. [footnote omitted] (Id. at
> 639.)

27   Answer, ECF No. 31 at 54, accurately characterizing the record.

28

1    The fact that the trial court decided, errantly or otherwise, that the custodian testimony did

2    not require expertise is not something that can be laid at counsel's door.  Although petitioner

3    asserts that counsel then "let the matter go," such does not demonstrate unreasonably deficient

4    behavior—indeed, when a court has ruled, counsel risks antagonizing the judge by repeated

5    objections in the face of the prior ruling.

6    Petitioner also fails to recognize that this court cannot find the state courts "wrong," on

7    state law evidence admission matters.  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  All of the

8    state courts reviewing petitioner's ineffective assistance claim have rejected the ineffective

9    assistance claim—on both Strickland aspects—by an explicit or implicit finding that the trial

10   court did not err in permitting the cell phone tower proximity evidence.  Moreover, the courts are

11   divided today as to whether such testimony must come in through expert evidence.  See United

12   States v. Graham, supra, 796 F.3d at 364-65 (lay testimony acceptable for the matters quoted

13   above regarding connectivity to the closest tower, but unacceptable as to other intricacies as to

14   how cell phones work); United States v. Ransfer, supra, 749 F.3d at 937 (lay testimony

15   acceptable); but see United States v. Banks, supra, 2015 WL 751953 (expert testimony necessary

16   on most aspects of cell phone operation).

17   Finally, petitioner challenges the "error" of the trial court, unfiltered by an ineffective

18   assistance claim, in permitting "false evidence," i.e., the assertedly incorrect cell tower proximity

19   evidence,  to be placed before the jury.  Petitioner's counsel knows that federal habeas law will

20   not allow an AEDPA challenge to prejudicial evidence erroneously admitted.  Holley v.

21   Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).[7]  Therefore, he posits the claim as a "false

22   evidence" claim in violation of due process.  See Napue, and other cases discussed supra.

23   However, this tortured construction of Napue and like cases cannot stand.  "False" in the context

24   of Napue, connotes the knowing use of perjurious or false evidence, not simply evidence that

25   petitioner, or even later courts, determine to have been incorrectly admitted because it was

26   contested or inaccurate.  The Ninth Circuit has set forth the prerequisites for a false evidence

27

28   _____
     [7]  The undersigned was recently affirmed in this respect by the Ninth Circuit, Walker v. Davis,
     No. 14-15342, 2015 WL 5603996 (9th Cir. Sep. 24, 2015).

1  claim as discussed previously.  Hayes v. Brown, supra.  Here there is no allegation that that the

2  prosecution introduced evidence which it knew, or should have known, was false.

3       2.  No Necessity for an Evidentiary Hearing

4       Petitioner vigorously argued that the Superior Court on state habeas review violated state

5  procedural law by not holding an evidentiary hearing on the accuracy of the Shenck declaration

6  because under state law, such a declaration must be initially accepted as true in determining a

7  *prima facie* case.  The argument continues in effect to posit that since petitioner did not have a

8  full and fair opportunity to prove his case in state court, the factual determination of the court to

9  essentially reject the Shenck declaration obviates the application of Cullen v. Pinholster, 563 U.S.

10  170 (2011), and the relatively generous pre-AEDPA standards of permitting evidentiary hearings

11  in federal court are in effect.  See Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014).

12       However, petitioner misapprehends the nature of the Superior Court's *initial*, dispositive

13  ground for rejecting ineffective assistance, and presumably that of the higher courts as well.  Like

14  the undersigned here, the Superior Court did not initially find that Mr. Shenck was factually

15  incorrect; rather, only that counsel was not unreasonable in "failing to support" his Kelly motion

16  because previous appellate court acceptance of cell phone location evidence demonstrated

17  acceptance of the use of single cell towers for location purposes.  Thus, this court could presume

18  Mr. Shenck correct, but also that the previous usage of cell phone location evidence was well

19  accepted at the time.[8]

20       It may be true that the Superior Court could have set forth more evidence of the practice

21  of courts to accept single tower location data, but as the citations of the undersigned herein point

22  out, the overwhelming acceptance of cell phone single tower location evidence by courts *even to*

23

24  _____

   [8]  It should be evident by this time that the undersigned is making no factual finding on the

25  correctness, or incorrectness, of the Shenck declaration.  This is so despite the seeming
   improbability of petitioner's phone being shown in the area proximate to the murder and

26  proximate to the murder time on several occasions, and the lack of such proximate readings at any
   other pertinent time.  While the Superior Court's materiality findings, and alternative ruling,

27  question the Shenck declaration, ultimately the court found that the evidence was immaterial
   because of other evidence in the case.  The undersigned has not, and need not, determine

28  materiality.

1   *this very day*, and a fact not at all disputed by Mr. Shenck in terms of citation to authority,

2   completely supports the Superior Court ultimate *legal* conclusion that counsel did not act

3   unreasonably.

4        To the extent that the straight claim of "false (incorrect) evidence" is at issue, something

5   that can exist in California law despite conventional wisdom to the contrary, no hearing is

6   necessary because no *federal* claim exists herein for the presentation of material, incorrect

7   evidence without fault on the part of the prosecution.  And given the widespread acceptance of

8   single tower cell phone technology, the prosecution was not at fault.

9        C. The Gang Evidence Photos

10       This claim is the last of petitioner's significant claims.  It appears from the record as a

11  whole that the prosecution attempted to flavor this prosecution with "gang evidence"—with no

12  hard connection involving petitioner with gangs.  It also appears undisputed that any gang relation

13  to this murder occurred in the shooting of *petitioner*, i.e., he was a person attempting to break up

14  a gang dispute at a party which he attended; petitioner got shot for his efforts.  It was the

15  prosecution's theory that petitioner's motive for the murder at issue was *personal* retaliation—

16  i.e., petitioner had been shot without legitimate provocation for his being shot at the

17  aforementioned party, and he was angry at this turn of events.  There was not a motive presented

18  that the murder for which petitioner stood trial was motivated by a need for *gang retaliation*.

19       The first gang flavored evidence occurred when the prosecution introduced a video of a

20  generic "Crip walk."  The relevance of that "walk" to the murder petitioner was convicted of is

21  difficult to decipher.  While it is true that previous to the murder in question petitioner had

22  attended a party in which gang members had exhibited hostility, including demonstrations such as

23  a "Crip walk," designed to inflame other gang members, it is also undisputed in the record that

24  petitioner had no connection to any hostile gang except for *his* unfortunate shooting at the hands

25  of a gang member when petitioner attempted to defuse any hostilities which might have otherwise

26  resulted in a serious incident between gang members that night.

27       The evidence in question in this claim, pictures of petitioner with family in which some

28  "signs" were flashed, ostensibly "gang signs," was initially ruled inadmissible except as to photos

33

1 | not depicting the signs or redacted to eliminate the gang signs. RT 113-115.[9]

2 | The photographs had some relevance in that in addition to petitioner, the pictures included

3 | petitioner's two half-brothers and his cousin Dalaza. The two half-brothers had some connection

4 | with the case in that they may have aided petitioner in setting up the retaliation, and of course,

5 | according to the prosecution, Dalaza was involved post-murder in conveying information to

6 | petitioner at petitioner's request, as well as, according to the defense, a person whose physical

7 | description more closely resembled the eyewitness-to-the-murder descriptions.

8 | During the course of the trial, the prosecution called petitioner's girlfriend, Francine

9 | Guzman, who according to petitioner, gave fairly favorable testimony for petitioner-- at least it

10 | showed him as attempting to be peacemaker at the party where he was ultimately shot. Just prior

11 | to the "door opening" question, defense counsel had been eliciting testimony concerning persons

12 | who had been at the party where petitioner was shot. RT 929-930. Part of that testimony

13 | concerned the fact that some persons there were associated with gangs. Then, trial counsel asked

14 | the following two questions (RT 930-931):

15 | Q. Is that--that gang lifestyle or anything is no part of your life, is it?

16 | A. No.

17 | Q. And was it any part of Andre Pulido's life?

18 | A. No.

19 | Immediately thereafter defense counsel went back to asking general questions about the

20 | witness' family members. A good bit of questioning elapsed before the prosecution asked to

21 | approach the bench, and the judge and counsel went into chambers. The prosecutor urged that he

22 | be allowed to show the unredacted "gang sign" photos because of the defense counsel question

23 | set forth above, and also because counsel had questioned the witness about the color of clothes

24 | and a bandanna petitioner wore to the effect that such clothes did not place petitioner in any

25 | untoward group. The judge remarked that he had actually annotated defense counsel's question at

26 |

27 |
28 |

[9] The undersigned is unaware from the record that the signs being shown were actually bona-fide gang signs as opposed to a jocular demonstration by family members in a photograph, much like a person using fingers to show a "V" sign over another's head. The exhibits attached to the Superior Court petition appear to be depicting a lighthearted scene.

the time it was asked as "opening the door" to petitioner's supposed gang associations.  RT 996.

Defense counsel responded that the prosecutor was playing up gang inferences of certain persons

at the party, and leaving the inference that petitioner was part of that scene or lifestyle.  Defense

counsel specifically argued:

> And –and for you to allow the picture in is to basically end the case.  That ends the
>
> case, Judge.  Let's be clear about it.  That's how I feel.  It affects my credibility, it
>
> affects Andre's credibility.  And I thought based upon what he [the prosecutor] did
>
> in his direct, that I could ask the questions I was asking…..Either way, we're
>
> gonna get here because he said, "I want gang evidence in."  You said, "It's not a
>
> gang charge, Mr. Kindall."
>
> We redacted those [gang] events.  I stipulated to those things.  Then we've got
>
> testimony [elicited by the prosecution] about Gotti and "O" and, we've got a Crip
>
> on a video dancing.  And then the Court says to me, "Oh, Mr. Johnson, you've
>
> gone too far, you've opened the door."

(RT 1000.)

After much more discussion, the court ruled that the three "Macy" pictures would come in

which showed petitioner and family members doing some type, perhaps, of gang signs.  The court

then gave the following limiting instructions:

> It's important that you understand that there is no allegation that the death of Mr.
>
> Rodrigo Rodriguez was done for gang related purposes.
>
> It is important that you understand that there is no allegation that Mr. Pulido is or
>
> was a validated gang member.
>
> It is important that you understand the next testimony and evidence presented is
>
> given and will be given as it relates to Ms. Guzman's credibility and individuals
>
> who are identified in certain documents that will be presented to you again in her
>
> upcoming testimony.

(RT 1015.)

The pictures were published to the jury and presented to Ms. Guzman; she reiterated that

1    such had not changed her mind that petitioner was not involved in gang culture.  (RT 1018.)

2          The undersigned agrees with petitioner to a point—the admission of the pictures depicting

3    petitioner throwing so called "gang signs," was unwarranted and prejudicial to a degree.  Also, at

4    times, "opening the door" to prejudicial evidence can demonstrate unreasonable conduct on the

5    part of counsel—but this is not true for *every* situation.  See Edwards v. Lamarque, 475 F.3d 1121

6    (9th Cir. 2007) (en banc).  Nor do counsel's statements at trial concerning his or her actions prove

7    unreasonableness or prejudice.  Id. at 1126.  In this case, the undersigned cannot agree that

8    counsel was AEDPA unreasonable in his questioning, or that, considering the evidence as a

9    whole, the end result of the photos publication to the jury was AEDPA prejudicial.  That is,

10   applying the double deference inherent in a Strickland analysis, the state court's conclusions

11   concerning unreasonableness and prejudice cannot be overturned.

12         The Superior Court based its ruling on prejudice and not whether counsel's actions were

13   reasonable.  As to the latter point, the lower court made no pronouncement at all.  However, in an

14   AEDPA analysis, every reasonable argument to uphold the verdict must be indulged.  Harrington

15   v. Richter, 562 U.S. 86, 102 (2011).  While it is presumed that the higher courts in their silent

16   denial adopted the written prejudice analysis of the Superior Court as their reasoning, that does

17   not mean that the higher courts adopted the silence of the lower court on an unaddressed point.

18   "In the same vein, if a state court does not explicitly state the reason for denying a claim, we

19   presume that the state court adjudicated the claim on its merits."  Murray v. Schriro, 746 F.3d

20   418, 450 (9th Cir. 2014).  Combining the above authority, the undersigned will indulge every

21   reasonable argument to uphold the state court's denial of ineffective assistance of counsel.  If this

22   were not the case, this court would be obliged to find that the silence of the lower courts on a *sine*

23   *qua non* aspect of ineffective assistance must be found in petitioner's favor.  This cannot be the

24   case after AEDPA.

25         The undersigned has already set forth the standards for ineffective assistance of counsel,

26   and such will not be repeated here.  In reading the entirety of the transcript, especially trial

27   counsel's argument to the judge, it is clear that counsel believed the prosecution had sneaked in

28   prejudicial gang references, e.g., crip walk video, focus on gang affiliations of persons at the party

where petitioner was shot.  Although counsel was cognizant that the court had explicitly kept out the photos at issue because this was not a "gang case," he did not believe that he was "opening the door" to admission of the photos, by asking one question concerning petitioner's lack of gang culture beliefs—especially after the flavor of gang activity was hanging heavy in the case. Rather, he believed he was simply pushing further a door which had already been opened.

Yes, counsel took a risk in doing this.  And yes, in hindsight, it might have been better had counsel asked the court at a bench conference to ask the question of Ms. Guzman that he did.  But the court cannot find, nor could all reasonable jurists find, that counsel's asking the question as he did, with the background existing when he asked the question, was so far below the standards of reasonable counsel, that trial counsel can be termed, "incompetent."  Not every counsel decision which does not work out as intended indicates that counsel is incompetent.  See e.g., Givens v. Martel, 2012 WL 892178 * 19-20 (N.D. Cal. 2012).[10]

On the matter of prejudice, the court cannot find the reasoning of the Superior Court, or the decision of the higher courts to be AEDPA unreasonable.  It is true that the Superior Court made a factual error in referring to only one picture being introduced instead of the three which were.  But petitioner makes no argument that had only one picture been introduced, insufficient prejudice would have accrued, i.e., it was the fact of three pictures and not one which made all the difference.  The pictures showed essentially the same activities taking place.

The undersigned has previously commented that the gang evidence in this case was unwarranted in terms of its minimal relevance and prejudicial nature.  However, petitioner must show that the introduction of this prejudicial evidence undermined confidence in the verdict given

---

[10]  Petitioner's criticism of trial counsel's "opening the door" by asking Ms. Guzman a character evidence type question seems totally inconsistent with his argument in the very next section that counsel was ineffective for not calling other character witnesses to testify about petitioner's peacefulness.  Photos in which participants are being characterized as being in the gang lifestyle are inconsistent with the character trait of peacefulness—that is the very prejudice petitioner complains of herein.  Can there be any doubt that had the character witnesses testified to petitioner's peaceful disposition, the gang photos would have been shown to them?  Present counsel would whipsaw trial counsel—he was ineffective for asking Guzman about petitioner's lack of gang indicia, i.e., peacefulness, but was at the same time ineffective for not asking other witnesses about it.

1    the totality of the evidence.  This he cannot do.  Although petitioner disputes the significance or

2    admissibility of adverse evidence against him, the undersigned takes the record as it is found.

3    The gun involved in the murder at issue was found in petitioner's room; petitioner looked

4    culpable after he attempted to mislead the police into thinking he did not utilize the room.  His

5    cousin, Delaza, directly implicated petitioner in the murder with his testimony recounting

6    petitioner's possibly case-ending admissions regarding "shooting the wrong dude."  Petitioner's

7    cell phone location data indicated that he was proximate to the murder scene close to the time the

8    murder was committed.  Evidence was submitted that petitioner was enraged after he had been

9    shot at the party— finding personal retaliation motive, not gang motivation, for the murder was

10   not a stretch for the jury.

11         It is true that evidence contrary to the finding of petitioner as the culprit existed.

12   Petitioner knew the person who had shot him, although the record is unclear the extent of time

13   petitioner was familiar with this person.  And why was petitioner relatively quick to conclude that

14   "he had shot the wrong dude," i.e., this indicates he knew who the real culprit had been all along.

15   It did not make sense for petitioner to have just killed anyone if the motive for the murder had

16   been personal retaliation.  (Gang retaliation can be much less discriminating.)  The eyewitness

17   testimony describing  petitioner was weak, was not based on in-court identification, and did

18   implicate Delaza to some extent.  Moore's testimony was seemingly incredible no matter who it

19   favored at any particular time.  However, the evidence obscuring petitioner as the real shooter

20   does not outweigh the evidence showing him to be the person who killed the victim.  The gang

21   pictures do not shift the balance to the point where confidence in the verdict is undermined.

22         The Superior Court heavily relied on the limiting instruction about use of the photos—it

23   could only be used to assess Ms. Guzman's credibility.  There is abstract appeal to petitioner's

24   argument that once the stink of prejudicial evidence is set before the jury, it will be difficult for

25   the jurors to follow an instruction to ignore the smell.  Nevertheless, there are weak limiting

26   instructions and there are stronger ones.  The instructions here were strong and succinct and

27   understandable.  "*It is important to understand*" was the emphatic preface to each of the limiting

28   instructions.  The presumption that the jury follows instructions of the court has some force in

38

light of the manner in which the instructions were given.

Finally, trial counsel's assessment of the prejudicial effect—it ends the case—is entitled to consideration, even knowing that it is not dispositive.  Nevertheless, the on-the-spot admission of trial counsel, just stung by a finding that he had opened the door to prejudicial evidence, must be viewed as possible self-defense reaction and a hyperbolic attempt to persuade the judge to keep the photos out.

*De novo* review of this issue could be decided either way, although the undersigned would conclude that counsel was not ineffective, nor was there sufficient prejudice.  However, that is not the standard here.  Fair minded jurists in reviewing the issue must have only one reasonable way to decide the issue.  Overall, and despite the favorable evidence, it was reasonable to find from the state court's perspective that counsel did not act below an objective standard of competence and/or the prejudicial impact was insufficient.

D.  The "Failure" to Call Character Witnesses

Petitioner criticizes the asserted failure of trial counsel to call character witnesses.  It appears to be undisputed that petitioner was a decent human being prior to the events of this case, or in the words of petitioner's present counsel, a peaceful human being.  The undersigned need not assess the reasonableness of defense counsel in not procuring the evidence for trial because the prejudice issue is dispositive to the claim, and in any event, overlaps substantially with the reasonableness prong.

Petitioner's presentation that character witnesses would have staved off prejudicial impact of gang evidence or other adverse aspects of the case begs the issue.  The character witnesses were to testify about petitioner's character prior to being shot in the face.  See declarations attached to the Superior Court Petition for Habeas Corpus.  The overriding issue before the jury (despite the flavor of gang evidence) was petitioner's disposition *after* being shot.  "It seems safe to assert" that being shot in the face does have a tendency to make many persons very angry.[11]

---

[11]  Petitioner argues that "[i]t seems safe to assert that the *vast* majority of people do not feel embarrassed or humiliated at getting shot…."  Petitioner's Memorandum, ECF No. 26 at 64. How about anger?  Anger might well be a motivating feature of seeking retaliation.

1   Did petitioner succumb to that anger and plan retaliation, or did he continue as a mild mannered,

2   get-over- it type of person?  The character evidence now proffered by petitioner does not touch on

3   this issue.  The evidence of petitioner's pre-shot character could have backfired on petitioner, see

4   below, but in any event it would not have helped that much in general terms, at least not to the

5   extent that reasonable jurists would have their confidence undermined in its absence.

6        Moreover, regardless of whether it opened the door to admitting "gang" pictures

7   (something which might well have occurred in any event had petitioner attempted to show his

8   good character and peacefulness through the uncalled character witnesses), the best character

9   witness for petitioner was his girlfriend, Ms. Guzman.[12]  One cannot read her testimony and not

10  come away with the impression but that  she was a level-headed, intelligent witness.  Her

11  testimony that petitioner was not into the gang lifestyle, a fact she would have been aware of pre

12  and post-shooting of petitioner, was about as good as it gets.

13        This claim should be denied.

14        E.  Remaining Issues (Claims 9-12)

15        As he did in the Superior Court, petitioner faults his trial counsel for inadequately

16  investigating, and preparing for the case.  Primarily, counsel is faulted for not interviewing

17  specific, potential witnesses either by himself, or through an investigator.   However, petitioner

18  does not attempt to show how such investigation would have significantly aided his case.  Take,

19  witness Guzman, for example.  She testified favorably for the defense.  Petitioner does not

20  elaborate what in addition to the actual testimony should have been elicited, or would have been

21  elicited if she had been interviewed by the defense.  There might well have been reasons not to

22  interview this witness past what the prosecution had procured for reasons of impeachment

23  potential.  The same holds true for the other witnesses specified.

24        Petitioner argues that Dalaza may have been the actual culprit due to his similarity in

---

25  [12]  The undersigned cannot reconcile petitioner's belief that the prosecutor who jumped at the
26  chance to admit so called gang indicia photos when Ms. Guzman was asked one question about
    petitioner's character, would have been asleep at the wheel during the testimony of other
27  character witnesses.  Either the door would have been opened with the character witnesses
    themselves, or, assuming the door was already opened, the gang pictures would have been shown
28  to each character witness again and again thereby multiplying  prejudice.

40

1    appearance with those descriptions given by eyewitnesses.  Also, Dalaza may have had access to

2    the gun in question as well as petitioner's car.  But the "failure to investigate" is not supported by

3    any presently found information not already known at the time of trial.  There is no way this claim

4    demonstrates any prejudice from any alleged failure to investigate.  Evidently, even petitioner

5    himself cannot add anything to this claim.

6         Petitioner claims that he is actually innocent (Claim 10) due to the fact that "[t]he

7    evidence adduced at trial did not overwhelmingly establish that [petitioner] shot and killed the

8    victim…."  Petition at 18.  Even assuming that the Supreme Court has established an actual

9    innocence claim, something the parties dispute, the claim herein does not come close to meeting

10   the standard as articulated by the Ninth Circuit—a clear and convincing affirmative showing of

11   innocence by the introduction of newly discovered evidence.  Carriger v. Stewart, 132 F.3d 463,

12   476-477 (9th Cir. 1997) (en banc).  Criticizing or disputing the evidence received at trial does not

13   constitute an "affirmative" showing.  For example, petitioner strenuously urges that the cell phone

14   evidence received at trial was unreliable, and hence inadmissible.  This is not an affirmative

15   showing.  An affirmative showing would include, at the very least, new cell phone evidence that

16   clearly placed petitioner at a location not proximate to the murder scene at the time of the murder.

17   Petitioner does not set forth *any* new, affirmative showing for his actual innocence claim with the

18   exception of the Moore recantation, which for reasons already expressed, cannot be utilized.

19        Claim 11 concerns the alleged cumulative impact of all errors associated with ineffective

20   assistance of counsel.  As the court has found no error, i.e., it has not found that counsel's

21   performance was below an objective standard of reasonable counsel for any claim much less two

22   or more claims, no cumulative impact of prejudice can be assessed.

23        Finally, Claim 12 involves the asserted truncation of impeachment of the witness Dalaza,

24   a claim decided adversely to petitioner by the Court of Appeal on direct review.  As has been set

25   forth previously, Dalaza's physical appearance was similar to some of the eyewitness

26   descriptions.  Moreover, Dalaza had testified to damaging conduct and admissions by petitioner

27   which were important evidence in the case.  Finally, Dalaza gave this incriminating evidence to

28   the police after having been threatened to be prosecuted for the murder.  The background facts to

41

this claim are set forth in the Petition at 21:

> The defense established that Dalaza had a felony criminal history and had made his claims regarding Pulido's purported admissions only after the interrogation detective had lied to Dalaza, falsely informing him that an eyewitness had identified him as  the  killer, that his fingerprints had been found on the murder weapon, and that he faced either a death penalty or life imprisonment.

> The jury also learned that, at the time of trial, Dalaza was on felony probation for the felony conviction of evading an officer. Following a high-speed car chase in 2006 that ended with Dalaza's crashing his vehicle into a parked car, he bolted from his vehicle and started running.

> The trial court, however, refused to permit the defense to adduce additional relevant facts to impeach Dalaza's credibility.  The jury did not learn that the incident had begun when an officer heard gunshots, the police received a report that shots had been fired from a vehicle, casings were found in the street in connection therewith, and the police were chasing Dalaza because of that shooting.

> The defense sought to impeach Dalaza with the fact that, when caught, he lied to the police.  He told them that the reason he fled was because he had a suspended license.  The defense wanted to ask whether the real reason he fled was because he had just shot a gun from the car.  If he denied it, it wanted to call the police officer who had responded to the shots-fired call and the officer who took Dalaza's statement.  It also argued the evidence was relevant to the inadequacy of the investigation into the murder charged against Pulido, which was needed to support the argument that insufficient effort had been made to ascertain whether Dalaza was the individual who had committed that murder.

> The trial court refused to permit the requested cross-examination on the basis that the defense offer of proof was insufficient, and such preclusion was necessary to protect the jury from confusion and an undue consumption of time.

The claim is posited as having both deprived petitioner of his cross-examination rights and to present a defense.  The more cognizable claim is that of failure to permit complete cross-examination in violation of Davis v. Alaska, 415 U.S. 308, 315-16 (1974); see also  Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1985):

> The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), "means more than being allowed to confront the witness

42

physically." *Davis v. Alaska,* 415 U.S., at 315, 94 S.Ct., at 1110. Indeed, "'[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *Id.*, at 315–316, 94 S.Ct., at 1110 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)) (emphasis in original). Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis, supra*, at 316–317, 94 S.Ct., at 1110 (citing *Greene v. McElroy*, 360 U.S. 474, 496 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)).  It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fenstere*r, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam ) (emphasis in original).

Here, petitioner was permitted to impeach Dalaza with his conviction; after all, such a conviction was a matter of record.  However, petitioner sought to question Dalaza as to matters which were unproven, and for whatever reason, apparently not charged (the shooting of a weapon from a car).  This would have involved a mini-trial as the prosecution would have to present all the reasons why a gun charge was not pursued.  Dalaza might well have to plead the Fifth Amendment.  Moreover, petitioner was seeking to delve into a witness' state of mind about an incident that had nothing to do with petitioner's murder trial.  Petitioner's impeachment protestations aside,[13] he was seeking to delve into this incident to show that Dalaza fired a gun then; maybe it was he who fired the gun in petitioner's case.  The relevance of such an inquiry was very suspect as there is no logical connection between wildly firing a gun on one occasion (assuming that could be proved) and firing a gun on another with intent to kill a specific person

---

[13]  Petitioner had already been shown to be not initially forthcoming to the police in *this* case. Indeed, Dalaza had to be threatened before he related petitioner's involvement to the police. Adding another such example of lack of honesty was not likely to be all that helpful.

43

1   after lying in wait.

2          The undersigned cannot find that the state courts were AEDPA unreasonable in

3   their application of the principles of Supreme Court authority.

4          Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must

5   issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A

6   certificate of appealability may issue only "if the applicant has made a substantial showing of the

7   denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in these

8   findings and recommendations, a substantial showing of the denial of a constitutional right has

9   not been made in this case.

10  *Conclusion*

11         Accordingly, IT IS HEREBY RECOMMENDED that:

12         1.  The petition for writ of habeas corpus in this case be denied;[14] and

13         2.  The District Court decline to issue a certificate of appealability.

14         These findings and recommendations are submitted to the United States District Judge

15  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

16  after  being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within fourteen days after service of the objections.  The parties are

20  advised that failure to file objections within the specified time may waive the right to appeal the

21  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED:  October 13, 2015

23                              /s/ Gregory G. Hollows

24                          UNITED STATES MAGISTRATE JUDGE

25

26

27  _____

[14]  The undersigned has been aided by the very competent presentation of both counsel in this
28  case.

44